*This opinion is subject to revision before final publication in the Pacific Reporter*

**2024 UT 13**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Respondent,*

*v.*

SHANE CRAIG SMITH,
*Petitioner.*

No. 20220768
Heard September 6, 2023
Filed May 2, 2024

On Certiorari to the Utah Court of Appeals

Fourth District, Provo
The Honorable James M. Brady
No. 191403507

Attorneys:

Jennifer L. Foresta, Douglas J. Thompson, Provo, for petitioner

Sean D. Reyes, Att'y Gen., David A. Simpson, Asst. Solic. Gen.,
Salt Lake City, Ryan McBride, Provo, for respondent

CHIEF JUSTICE DURRANT authored the opinion of the Court in
which ASSOCIATE CHIEF JUSTICE PEARCE, JUSTICE PETERSEN,
JUSTICE POHLMAN, and JUDGE MOW joined.

Having recused herself, JUSTICE HAGEN does not participate
herein; DISTRICT COURT JUDGE ADAM T. MOW sat.

CHIEF JUSTICE DURRANT, opinion of the Court:

## INTRODUCTION

¶1 Shane Craig Smith met "Emily,"[1] a thirteen-year-old girl, on the internet. After an eventful three hours of online conversation, Smith drove to a gas station in Lehi to meet Emily, with the stated plan of having her perform multiple sex acts in exchange for Smith driving her to California. Fortunately, Emily was not an actual teenager, and instead was a persona used as bait in a police sting operation.

¶2 Smith was arrested at the gas station and charged with various crimes, including attempted child kidnapping, attempted rape of a child, and attempted sodomy of a child. He eventually pled guilty to most of these charges while reserving the right to appeal two issues: whether there was sufficient evidence to bind him over for trial on the attempt charges, and whether he was entrapped as a matter of law. The court of appeals affirmed his convictions, and we now do the same.

## BACKGROUND[2]

¶3 In November 2019, Utah County Sheriff's Detective Bagley accessed Whisper, a mobile app, as part of a child sex trafficking operation. Whisper is a text-based dating app where anonymous users can create private chat rooms. To create a Whisper profile, users must affirm that they are at least eighteen years old. Det. Bagley created a fake profile, Emily, using an image of a woman who was over the age of eighteen. He then went to an adult-themed forum and created a post implying that Emily was looking to meet up with someone for a sexual encounter.

¶4 Smith was one of many individuals who responded to this post by initiating a private chat conversation with Emily. Shortly into their conversation, Emily disclosed that she was thirteen years

---

[1] As explained below, *infra* ¶ 3, the girl that Smith believed he was talking to was actually a fictitious persona created as part of a sex trafficking sting operation. This persona was never given a name, but we refer to her as "Emily" for simplicity.

[2] "To determine whether a defendant should be bound over for a trial, a magistrate must view all evidence in the light most favorable to the prosecution and draw all reasonable inferences in favor of the prosecution. We recite the facts consistent with that standard." *State v. Schmidt*, 2015 UT 65, ¶ 4, 356 P.3d 1204 (cleaned up).

old, had "r[u]n away from home," and wanted to "go to Cali[fornia]." She asked Smith if he would "give [her] $200 for food and cash" so she could "pay someone for a ride." In exchange, she promised she would "do whatever [he] want[ed]." Smith, who had opened the conversation by sending Emily photos of his penis, responded with hesitation. Not hesitation about whether it was appropriate for him to continue a sexually charged conversation with someone he now knew to be a child, but instead hesitation about whether Emily was "a cop."

¶5    Smith tried to resolve this concern by asking Emily to send him nude photos. When Emily refused, he insisted that she send clothed photos of her in specified poses to prove that she was "a real person" and "[n]ot a cop." Emily responded by sending photos of a twenty-three-year-old woman in the specified poses.

¶6    Apparently satisfied, Smith arranged to meet Emily at a gas station in Lehi and discussed what sex acts she would perform in return for him driving her to California. After Emily asked if he wanted oral or vaginal sex, Smith said the choice was "up to [her]." Emily responded that she would do both, and Smith seemed to accept that offer. He later specified that he wanted Emily to begin performing oral sex as soon as the two started driving together, and that they would additionally "need to have some fun" before they arrived in California. Once Emily indicated that she was ready to be picked up, barely three hours after their conversation began, Smith drove to the agreed-upon gas station. He texted Emily that he had arrived, flashed his headlights to help her identify his car, and told her to come over and get in.

¶7    Smith was then arrested in the parking lot. After waiving his *Miranda* rights, he told the arresting officers that he had come to the gas station to meet a thirteen-year-old girl, and that he had wanted to have both oral and vaginal sex with her. Smith was charged with several felonies, including attempted child kidnapping, attempted rape of a child, and attempted sodomy of a child.

¶8    After a preliminary hearing, Smith moved the district court to decline to bind over the counts of attempted rape of a child, attempted sodomy of a child, and attempted kidnapping of a child. Smith argued that the State's evidence regarding the attempt crimes—evidence about his intent to have sexual contact with a child and arrival at the agreed-upon location to meet that child—did not show that his actions rose beyond solicitation or mere

preparation and was therefore insufficient to support probable cause on the "substantial step" element of the attempt statute. Acting as a magistrate, the district court denied the motion and bound over all counts for trial.

¶9 Smith then filed a motion to dismiss all charges on entrapment grounds. The State opposed the motion. After an evidentiary hearing, the district court denied Smith's motion, concluding that Smith had not shown that he was entrapped as a matter of law. Smith eventually entered a conditional guilty plea to attempted child kidnapping, attempted sodomy of a child, and enticement of a minor.[3] This conditional plea allowed Smith to appeal the district court's bindover ruling and entrapment determination.

¶10 Smith timely appealed to the Utah Court of Appeals, where he raised two issues: (1) "whether there was insufficient evidence to bind over the attempt charges" for trial; and (2) "whether the district court erred by denying his motion to dismiss all the charges on the basis that he had been entrapped."[4] The court of appeals affirmed the district court's rulings.[5] Smith petitioned for certiorari. We have jurisdiction under Utah Code subsection 78A-3-102(3)(a).

## STANDARDS OF REVIEW

¶11 On certiorari, we review the court of appeals' decision for correctness and give no deference to its conclusions of law.[6]

¶12 A bindover determination is a mixed question of law and fact which receives "some deference . . . commensurate with the limited discretion under which a magistrate operates at a

---

[3] Utah's sexual violence statutes use the words "minor" and "child" inconsistently. "Minor" sometimes refers to any person less than eighteen years old, *see* UTAH CODE § 76-4-401(1)(a)(i) (enticement of a minor statute), but in other contexts refers to an individual who is between fourteen and sixteen years old, *see id.* § 76-5-401(1)(a) (unlawful sexual activity with a minor statute), with the word "child" used for individuals who are under fourteen years old, *see id.* § 76-5-402.1(2)(a) (rape of a child statute).

[4] *State v. Smith*, 2022 UT App 82, ¶ 1, 514 P.3d 620.

[5] *Id.* ¶ 32.

[6] *State v. Baker*, 2010 UT 18, ¶ 7, 229 P.3d 650.

preliminary hearing."[7] A district court's legal conclusions regarding entrapment are reviewed for correctness, and its factual findings are reviewed for clear error.[8]

## ANALYSIS

¶13  Smith raises two claims of error. First, he argues that the district court erred by binding him over for trial, and that the court of appeals erred in affirming that bindover. Second, he argues that the district court erred in denying his motion to dismiss due to entrapment, and that the court of appeals erred in affirming that denial. But Smith fails to show that either the bindover decision, the denial of his motion, or the court of appeals' review of those rulings is in error. Accordingly, we affirm.

### I. SMITH'S ACTIONS CONSTITUTE SUBSTANTIAL STEPS

¶14  In his first claim, Smith targets the district court's decision to bind him over for trial on all charges. The decision to bind a criminal defendant over for trial is made by a magistrate judge at the conclusion of a preliminary hearing.[9] At a preliminary hearing, the State must present "evidence sufficient to support a reasonable belief that an offense has been committed and that the defendant committed it."[10] On appeal, Smith challenges the decision to bind him over on three charges: attempted rape of a child, attempted sodomy of a child, and attempted kidnapping of a child.

¶15  The elements of attempt are provided by statute. "[A] person is guilty of an attempt to commit a crime" if they (1) "engage[] in conduct constituting a substantial step toward commission" of that crime, and (2) "intend[] to commit the crime."[11] Smith does not dispute that there was sufficient evidence

---

[7] *State v. Schmidt*, 2015 UT 65, ¶ 13, 356 P.3d 1204 (cleaned up).

[8] *State v. Hernandez*, 2020 UT App 58, ¶ 4, 462 P.3d 1283 (citing *State v. Torres*, 2000 UT 100, ¶¶ 8–14, 16 P.3d 1242; *State v. Curtis*, 542 P.2d 744, 746–47 (Utah 1975)).

[9] *See* UTAH R. CRIM. P. 7B(b); *State v. Ramirez*, 2012 UT 59, ¶ 8, 289 P.3d 444.

[10] *State v. Schmidt*, 2015 UT 65, ¶ 17, 356 P.3d 1204 (cleaned up).

[11] UTAH CODE § 76-4-101(1). Intent to commit the underlying crime is not required if, "when causing a particular result is an element of the crime, [the defendant] acts with an awareness that

(continued . . .)

for the district court to find that he had the intent to commit the crimes that underlie his attempt charges. He instead argues that binding him over on the attempt charges was inappropriate because his conduct was legally insufficient to constitute a substantial step toward committing any of the underlying offenses.

¶16 The attempt statute defines a substantial step. "[C]onduct constitutes a substantial step if it strongly corroborates the actor's [intent]."[12] Smith's claim that he did not commit substantial steps toward the crimes for which he was bound over relies on two of our cases that interpret this language: *State v. Arave*[13] and *State v. Johnson*.[14]

¶17 We begin with *Arave*. The defendant in that case, Arave, used his bicycle to block the path of a young boy who was riding a skateboard down a residential street.[15] Arave then offered the boy "$20 to allow [Arave] to perform oral sex" on him.[16] When the boy didn't respond, Arave "apologized" and the boy left.[17] Arave was subsequently convicted of attempted sodomy of a child.[18]

¶18 We reversed Arave's conviction on the ground that he hadn't taken a substantial step toward committing the underlying crime.[19] But the concern that led us to that conclusion dealt specifically with the distinction between two different crimes: solicitation and attempt.[20] Solicitation occurs when a person "with intent that a felony be committed," solicits "another person to

---

his conduct is reasonably certain to cause that result." *Id.* § 76-4-101(1)(b)(ii). This alternative element is not at issue here.

[12] *Id.* § 76-4-101(2).

[13] 2011 UT 84, 268 P.3d 163, *rev'g* 2009 UT App 278, 220 P.3d 182.

[14] 821 P.2d 1150 (Utah 1991).

[15] *Arave*, 2011 UT 84, ¶ 4.

[16] *Id.*

[17] *Id.*

[18] *Id.* ¶ 8; UTAH CODE § 76-5-403.1(2)(a) (Defining sodomy upon a child as including an actor that "engages in any sexual act" with an individual "younger than 14 years old," that involves "the genitals . . . [of] the individual and the mouth . . . [of] the actor").

[19] *Id.* ¶ 35.

[20] *See id.* ¶¶ 27–35.

engage in specific conduct that under the circumstances as the actor believes them to be would be a felony."[21]

¶19 In the context of that case, solicitation likely occurred when Arave confronted his target and asked if the boy would engage in felonious sex acts with him.[22] The legal problem was that the lower court had categorized those same acts—confrontation and request—as constituting a substantial step toward attempted sodomy of a child.[23] We held that this categorization was impermissible, as "[s]olicitation alone cannot constitute a substantial step toward the commission of a crime."[24] If that conflation were allowed, then the crime of attempt "would swallow the crime of solicitation."[25]

¶20 Smith argues that, like Arave, he did nothing more than solicit someone he believed to be a child to engage in sexual acts. The facts show that isn't the case. Smith likely did commit solicitation during his Whisper conversation with Emily; he asked her to engage in sex acts that would result in the commission of a felony and did so with the intent to carry out those acts. But this hypothetical solicitation offense was completed while Smith was still at his keyboard. His subsequent actions—driving to the meeting place, texting Emily his location, telling her to get into his car, and flashing his lights as an identifying signal—were beyond the scope of that offense. Allowing those additional acts to constitute a substantial step does not imperil the distinction between solicitation and attempt. As a result, the concern we had in *Arave* is absent here.

¶21 Smith's second argument is that the facts of his case are analogous to the facts of *Johnson*.[26] The defendant, Johnson, was convicted of attempted murder after she purchased counterfeit methamphetamine from an undercover police officer with the

---

[21] UTAH CODE § 76-4-203(1) (2011).

[22] *Arave*, 2011 UT 84, ¶¶ 32–35.

[23] *Id.* ¶ 31.

[24] *Id.* ¶ 27.

[25] *Id.* ¶ 28.

[26] 821 P.2d 1150 (Utah 1991).

stated intent of using the drugs to poison her husband.[27] On appeal, the case focused on whether there was sufficient evidence to show that Johnson's purchase of methamphetamine strongly corroborated her intent to use that substance to murder her husband.[28] Our decision that the evidence was insufficient to draw that conclusion beyond a reasonable doubt rested on three main points.

¶22 First, the drugs that Johnson purchased were multipurpose; methamphetamine can be used both as a poison or recreationally.[29] Second, the drugs weren't found in Johnson's possession when she was arrested shortly after purchasing them.[30] And third, the record was otherwise silent as to what Johnson did with the package of drugs she purchased. There was "no showing that she attempted to administer the [counterfeit methamphetamine]," and indeed, "no evidence as to what she did or attempted to do with it."[31] Based on those facts, we held that there was insufficient evidence to find that Johnson took a substantial step toward committing murder.[32] Instead, Johnson's acts were best characterized as "mere preparation."[33]

¶23 Unfortunately, the portions of *Johnson* that arrive at this conclusion do not specifically explain why "mere preparation" cannot constitute a substantial step.[34] Smith attempts to fill in the gap, arguing that Johnson's acts were merely preparation because, when Johnson was arrested, she was many steps removed from actually committing the crime of murder. And because "[t]here were many further steps that would need to be taken" before Smith

---

[27] *Id.* at 1154–56 & n.2. Johnson was charged with three counts of attempted murder based on her attempts to fatally poison her husband with three separate substances. *Id.* Our discussion of the case here focuses only on the second count.

[28] *Id.* at 1157.

[29] *See id.* (noting that Johnson "may have used [the counterfeit methamphetamine] herself").

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] *See id.*

could have actually committed the crimes he was charged with attempting, his "conduct also did not rise beyond preparation."

¶24 We decline to adopt this interpretation of *Johnson* for two reasons. The first reason is rooted in our endorsement of textualist statutory interpretation—an endorsement that was firmly in place when *Johnson* was decided.[35] That history leads us to assume that, even if we didn't explain our reasoning in *Johnson*, we were applying the attempt statute without any added gloss. And both then and now, the definition of substantial step provided by the attempt statute speaks for itself. The statute states that "conduct constitutes a substantial step if it strongly corroborates the actor's" intent to commit the underlying crime.[36] So if, in a particular case, preparatory actions are deemed not to constitute a substantial step, it is because the conduct in question did not strongly corroborate the actor's intent to commit the underlying crime under the circumstances, not because there is a categorical rule that preparation is insufficient as a matter of law.

¶25 The second reason is that the logic of *Johnson* is in line with a textualist interpretation of the attempt statute. As mentioned, one of the key facts we relied upon in that case was that the drugs Johnson purchased could have been used for multiple purposes. This, combined with the fact that the drugs weren't found on Johnson when she was arrested, made it plausible that she "may

---

[35] *See, e.g., Savage Indus., Inc. v. Utah State Tax Comm'n*, 811 P.2d 664, 670 (Utah 1991) ("The terms of a statute should be interpreted in accord with usually accepted meanings."), *abrogated on other grounds by Morton Int'l, Inc. v. Auditing Div. of Utah State Tax Comm'n*, 814 P.2d 581 (Utah 1991); *Utah County v. Orem City*, 699 P.2d 707, 708 (Utah 1985) ("It is a well-established rule of statutory construction that the terms of a statute should be interpreted in accord with usually accepted meanings.").

[36] UTAH CODE § 76-4-101(2). The attempt statute interpreted in *Johnson* is functionally the same as the present version, which is the version that applies to Smith's acts. *Compare id.* § 76-4-101(2) (1990) ("For purposes of this part, conduct does not constitute a substantial step unless it is strongly corroborative of the actor's intent to commit the offense."), *with id.* § 76-4-101(2) (2024) ("For purposes of this part, conduct constitutes a substantial step if it strongly corroborates the actor's [intent to commit the offense]."). For simplicity, we cite the present version.

have used [them] herself."[37] In other words, Johnson could have purchased the drugs either with the intent to use them recreationally *or* with the intent to use them to commit murder. And as a result, the "mere purchase of the [drugs]" did not strongly corroborate a homicidal intent.[38]

¶26  Accordingly, we reject Smith's argument that, so long as there are certain steps remaining before the underlying crime is completed, an act is mere preparation under *Johnson*.[39] But we agree that an act's causal proximity to the completed offense can be relevant to the question of whether that act strongly corroborates the actor's intent. And we keep that in mind as we turn to fully examine whether Smith took substantial steps toward committing the crimes for which he was bound over.

¶27  We begin, as did the court of appeals, by reciting the sequence of events that led Smith to the parking lot where he was arrested. After a conversation in which he solicited "both oral sex and sexual intercourse" in exchange for a promise to drive Emily to California,

> Smith arranged to meet [Emily] at a convenience store and then traveled to the meeting place in his vehicle. Once there, he parked in a position that would allow him to be seen from the front of the store. He then reestablished contact with [Emily], told her where he was parked, asked her to stand in a particular spot and to look for blinking headlights so that she could identify his vehicle, and then actually blinked his headlights as a signal and directed [Emily] to walk toward the headlights and get in the vehicle.[40]

---

[37] *Johnson*, 821 P.2d at 1157.

[38] *Id.*

[39] Another reason to disfavor Smith's theory is that, by attempting to count the number of steps remaining in a crime, it invites sophistry. Clever defense counsel might have argued that Johnson still had dozens of steps remaining in the crime of murder, as she would have needed to drive home, get out of the car, walk to the front door of her house, and so on.

[40] *State v. Smith*, 2022 UT App 82, ¶ 17, 514 P.3d 620.

¶28 The first crime we analyze is attempted child kidnapping. "An actor commits child kidnapping if the actor intentionally or knowingly, without authority of law, and by any means and in any manner, seizes, confines, detains, or transports a child without the consent of the child's parent or guardian . . . ."[41] Smith does not challenge the determination that he intended to kidnap Emily, and there is no issue of parental consent. So the relevant question is whether Smith's actions strongly corroborate his intent to seize, confine, detain, or transport Emily.

¶29 That question isn't hard to answer. There are certainly many reasons why someone would drive to a convenience store, the vast majority of which are perfectly innocent. But Smith drove to the arranged store, at the arranged time, and gave the arranged signal. There is no plausible reason why he would do so other than to carry out the arranged plan. That is sufficient for us to say that these actions strongly corroborate his intent to commit child kidnapping. Thus, the court of appeals did not err in concluding that Smith took a substantial step toward committing that crime. Considering the number of steps that Smith had left to take—one or two at most—doesn't change that outcome.

¶30 The same logic governs our analysis of the crime of attempted sodomy upon a child. Sodomy upon a child is committed when an actor "engages in any sexual act upon or with [a child] . . . [that] involves the genitals . . . of the actor . . . and the mouth" of the child.[42] Smith's Whisper messages make it clear that he agreed to give Emily a ride to California only because she promised to perform sex acts, oral sex among them. Those same messages indicated that he planned to have Emily start performing oral sex upon him as soon as they had "start[ed] driving." In that context, Smith's actions strongly corroborate his intent to commit sodomy of a child. Accordingly, the court of appeals did not err in concluding that Smith took a substantial step toward committing that crime. While there were more acts remaining to complete this crime than there were for child kidnapping, Smith's actions again leave little room for ambiguity.

¶31 The attempted rape of a child charge is the closest issue. To commit the crime of rape of a child, Smith would have had to

---

[41] UTAH CODE § 76-5-301.1(2).

[42] *Id.* § 76-5-403.1(2)(a).

have "sexual intercourse" with Emily.[43] As above, Smith's statements evince a clear desire to engage in intercourse, and his arrival at the convenience store was a necessary first step in that process. But unlike the prior two offenses, there were potentially more steps that Smith would have had to take before intercourse occurred. And this does introduce some ambiguity into the analysis; for example, it is possible that Smith would have been satisfied with just receiving oral sex and would not have requested vaginal intercourse as further payment.

¶32 Even so, we agree with the district court and court of appeals: Smith's actions strongly corroborate his intent to commit rape of a child. We come to that conclusion in large part because of the legal posture in which this issue arrives. The decision that Smith challenges is bindover, and we have repeatedly described the State's burden of proof for such decisions as a "low bar."[44] While the number of steps remaining may introduce doubts about Smith's intent, weighing such doubts is inappropriate because, at a preliminary hearing, all evidence and testimony must be viewed in the light most favorable to the State, and all reasonable inferences are drawn in favor of the State.[45] And Smith's conversation with Emily demonstrates an intent to engage in both oral and vaginal sex. When these factors are taken into account, we agree with the lower courts that, for the purpose of determining bindover, Smith took a substantial step toward committing rape of a child.

¶33 In Smith's last argument against the district court's bindover decision, he contends that our prior cases on attempt

---

[43] *Id.* § 76-5-402.1(2)(a). As the court of appeals noted in *In re C.N.*, 2023 UT App 41, 529 P.3d 1030, the rape of a child statute does not provide a definition of "sexual intercourse." *Id.* ¶ 24. Throughout this case, the parties have used the phrase in relation to the act of vaginal intercourse. Given that tacit agreement, we assume without deciding that the "sexual intercourse" required by the statute must be vaginal intercourse.

[44] *State v. Lopez*, 2020 UT 61, ¶ 48, 474 P.3d 949; *accord State v. Ramirez*, 2012 UT 59, ¶ 9, 289 P.3d 444 ("Although the guarantee of a preliminary hearing is fundamental, the evidentiary threshold at such [a] hearing is relatively low."); *State v. Jones*, 2016 UT 4, ¶ 12, 365 P.3d 1212 (describing the State's burden at a preliminary hearing as "light").

[45] *See State v. Schmidt*, 2015 UT 65, ¶ 4, 365 P.3d 1204.

impose a requirement that is not present in the text of the attempt statute. Specifically, Smith argues that these cases require that, for conduct to constitute a substantial step, it must be completed in physical proximity to the victim or target location. This misreads our precedent on this issue. Smith is correct that many of our attempt cases involve a defendant who completed their substantial step in physical proximity to the place where the crime was to occur.[46] But the attempt statute doesn't mention physical proximity.[47] And applying that gloss to the statute would complicate prosecutions for attempt crimes where target location is an ambiguous concept, such as attempted tax evasion.[48] We are thus not persuaded that this factual commonality between our prior cases can or should be construed as an implicit recognition of a necessary condition.[49]

## II. SMITH WAS NOT ENTRAPPED

¶34 Utah Code section 76-2-303 provides that entrapment "occurs when a peace officer . . . induces the commission of an offense in order to obtain evidence of the commission for prosecution by methods creating a substantial risk that the offense

---

[46] *See, e.g.*, *Tillman v. Cook*, 855 P.2d 211, 220 (Utah 1993) (setting mattress on fire "constituted a substantial step in the commission of aggravated arson"); *State v. Hickman*, 779 P.2d 670, 672 (Utah 1989) (entry into home with sawed-off shotguns constituted a substantial step toward the commission of robbery); *State v. Cantu*, 750 P.2d 591, 593–94 (Utah 1988) (threatening victim with knife and club and demanding to know where valuables were located constituted a substantial step toward the commission of robbery).

[47] UTAH CODE § 76-4-101(2) ("For purposes of this part, conduct constitutes a substantial step if it strongly corroborates the actor's mental state . . . .").

[48] *Cf. State v. Steed*, 2014 UT 16, ¶ 25, 325 P.3d 87 (listing examples of "what might constitute willful attempt to evade" paying taxes).

[49] It is not even a commonality shared by all our prior opinions on attempt. In *State v. Pearson*, for example, we upheld an attempted burglary conviction in a case where the defendant was arrested shortly after he began driving to the home that he intended to burgle. 680 P.2d 406, 407–08 (Utah 1984).

would be committed by one not otherwise ready to commit it."[50] It further states that government conduct that "merely afford[s] a person an opportunity to commit an offense does not constitute entrapment."[51]

¶35 The same section also establishes the procedure that applies to entrapment claims. A defendant may assert such a claim "by filing a written motion before trial" that identifies "the evidentiary foundation for the claim."[52] The district court then must "hear evidence on the issue" and "determine as a matter of fact and law whether the defendant was entrapped to commit the offense."[53] The bar for such a motion is high; a court will hold that entrapment occurred as a matter of law only when "reasonable minds acting fairly on the evidence should necessarily have a reasonable doubt as to the defendant's guilt."[54] If the defendant succeeds in showing entrapment as a matter of law, the district court "shall dismiss the case with prejudice."[55] A defendant who does not make that showing may present the issue "to the jury at trial."[56] Because Smith appeals the district court's denial of his motion asserting that he was entrapped as a matter of law, we will reverse the court of appeals' affirmance of that decision only if we determine that reasonable jurors would necessarily agree that entrapment occurred.[57]

¶36 Our precedent provides guidance on how to interpret and apply the statutory definition of entrapment in this case. For example, in *State v. Taylor*, we established that the statute's test is

---

[50] UTAH CODE § 76-2-303(1).

[51] *Id.*

[52] *State v. Dickerson*, 2022 UT App 56, ¶ 20, 511 P.3d 1191 (citing UTAH CODE § 76-2-303(4)).

[53] UTAH CODE § 76-2-303(4).

[54] *State v. Kourbelas*, 621 P.2d 1238, 1240 (Utah 1980).

[55] UTAH CODE § 76-2-303(5).

[56] *Id.*

[57] *See State v. Beddoes*, 890 P.2d 1, 3 (Utah Ct. App. 1995) ("We will therefore uphold the fact-finder's determination unless we can hold, based on the given facts, that reasonable minds cannot differ as to whether entrapment occurred. Only then can we hold that entrapment occurred as a matter of law.").

objective.[58] The statutory language focuses on the conduct of the government agent, and whether that conduct included "persuasion or inducement which would be effective to persuade an average person" to commit the crime in question.[59] The subjective characteristics of the defendant, such as whether the defendant was predisposed to commit the crime in question, are not considered.

¶37 *Taylor* also established that, though the statutory test mainly examines the conduct of law enforcement, the defendant's responses to that conduct can be relevant to that inquiry.[60] "[T]he transactions leading up to the offense, the interaction between the agent and the defendant, and the response to the inducements of the agent, are all to be considered in judging what the effect of the governmental agent's conduct would be on a normal person."[61] Subsequent cases applying this test have been careful to maintain the distinction between examining the defendant's responses to government inducement, which the entrapment statute allows, and examining the defendant's predisposition to commit a crime, which the entrapment statute forbids.[62]

¶38 Finally, we have recognized that entrapment cases tend to fall into two nonexclusive categories.[63] The first category "involves

---

[58] 599 P.2d 496, 502–03 (Utah 1979) (comparing the objective and subjective theories of entrapment and noting that the entrapment statute demonstrates "legislative intent to adopt the objective theory of entrapment" and to "specifically reject" the "subjective test").

[59] *Id.* at 503.

[60] *Id.*

[61] *Id.*

[62] *See* UTAH CODE § 76-2-303(6) ("In any hearing before a judge or jury where the defense of entrapment is an issue, past offenses of the defendant shall not be admitted . . . ."); *Taylor*, 599 P.2d at 503 (discussing and rejecting the use of a defendant's predisposition to commit a crime under the objective standard for entrapment).

[63] *See State v. Torres*, 2000 UT 100, ¶ 9, 16 P.3d 1242. Smith argues that the court of appeals erred by holding that entrapment could occur only within these enumerated categories. We do not read its opinion as imposing such a restriction. But we agree that entrapment could occur in a situation outside of the categories mentioned above.

improper police conduct in which the government agent applied persistent pressure or persistently pursued the defendant to commit the crime."[64] We found entrapment along these lines in *State v. Sprague*[65] and *State v. Kourbelas*.[66] In both cases, an undercover police officer approached an unknown individual and asked for help in acquiring marijuana.[67] In both cases, the defendant gave a noncommittal response, leading the officers to repeatedly contact the defendant over a period of several weeks.[68] During each subsequent contact the officer was the one who raised the topic of selling drugs, and the defendant ultimately did so only at the officer's prompting.[69]

¶39 The second category involves "appeals based primarily on sympathy, pity, or close personal friendships, or offers of inordinate sums of money."[70] *Taylor* provides a good example of the type of police conduct that falls into this category. The government agent in that case was an informant who had previously been in a romantic relationship with the defendant, Taylor.[71] The informant contacted Taylor, claimed to be going through painful withdrawals from heroin addiction, and pleaded for his help in finding drugs that would help alleviate her suffering.[72] Taylor, himself a former heroin addict who "had personally experienced the agonies of withdrawal, and could empathize with this girl he loved," eventually purchased heroin on the informant's behalf.[73]

---

[64] *Dickerson*, 2022 UT App 56, ¶ 37 (cleaned up).

[65] 680 P.2d 404 (Utah 1984).

[66] 621 P.2d 1238 (Utah 1980).

[67] *Sprague*, 680 P.2d at 405; *Kourbelas*, 621 P.2d at 1238–39.

[68] *Sprague*, 680 P.2d at 405; *Kourbelas*, 621 P.2d at 1239.

[69] *Sprague*, 680 P.2d at 405–06; *Kourbelas*, 621 P.2d at 1239.

[70] *Torres*, 2000 UT 100, ¶ 9 (cleaned up).

[71] *Taylor*, 599 P.2d at 503.

[72] *Id.*

[73] *Id.* at 503–04.

¶40 Smith argues his case falls into both categories. Upon reviewing the facts, however, we agree with the court of appeals that this "case does not fall into either."[74]

¶41 Unlike the government agents in *Kourbelas*, the police in this case did not persistently solicit Smith over a period of weeks; the entire conversation between Smith and Emily lasted less than four hours. Unlike the agents in *Sprague*, the police here did not bring up illegal activity even after Smith rejected their advances; the record of messages shows that Smith ignored multiple opportunities to exit or de-escalate the conversation, and repeatedly suggested illegal acts that he wanted to perform.[75] Smith correctly points out that Emily was an active participant in the conversation and was, in some cases, the first to bring up illegal activities. But those facts alone are insufficient to demonstrate entrapment as a matter of law.[76] And Smith otherwise fails to show that Emily's willingness to engage in sex acts constituted the sort of persistent pressure that our caselaw prohibits.

¶42 Law enforcement in this case also did not appeal to Smith's sympathy or pity, nor attempt to leverage a close personal relationship. The last of these would indeed have been impossible because Smith and Emily did not know each other before their Whisper conversation began earlier that evening. It is true that Emily was, in some ways, a sympathetic figure. She claimed to be in the precarious situation of a runaway child. But unlike the informant in *Taylor*, Emily did not ask Smith to commit a crime out of sympathy or pity. Emily asked first and foremost for legal, non-sexual assistance in the form of money that would help her "pay

---

[74] *State v. Smith*, 2022 UT App 82, ¶ 23, 514 P.3d 620.

[75] For example, after Emily first told Smith that she was thirteen, Smith demanded that Emily send him nude photographs "so [he could] know [she was] legit."

[76] *See Torres*, 2000 UT 100, ¶¶ 3–4, 13–14 (rejecting entrapment claim where a police informant proposed purchasing drugs from the defendant because the defendant ignored "several opportunities to back out of [the] drug deal," and because the defendant's "willingness to commit the crime [was] illustrated by his persistent . . . attempts to get the drugs to the informant, despite considerable difficulty").

someone for a ride" to California.[77] Her offer to perform sex acts was presented as a reluctant form of compensation for Smith's assistance. So where the defendant in *Taylor* was forced to choose between committing a crime or ignoring his former lover's pleas for help, Smith could have given Emily the help she wanted without breaking the law.

¶43 Smith responds by arguing that the police nonetheless "exploited [his] basic vulnerability" by placing Emily's initial post on "a forum of lonely people." We note at the outset that we do not agree that a defendant's subjective vulnerability to criminal suggestion can be fairly included in the entrapment analysis. Our cases on entrapment are clear that the analysis centers on whether law enforcement's methods "would be effective to persuade an *average* person" to commit the crime in question.[78]

¶44 But even if we assume for the purpose of argument that law enforcement's choice to target a vulnerable population could be relevant, the vulnerability targeted here is relatively benign.[79] This is not a case where police sent an undercover heroin dealer to vend his wares at a discount in front of a methadone clinic. Moreover, there are obvious differences between the legal desire for sexual congress with a consenting adult and the illegal desire to sexually victimize a child.[80] Smith's purported loneliness does not change the nature of the police conduct.

¶45 Smith has failed to show that the police conduct in this case created a substantial risk that an average person would attempt to commit the crimes that Smith attempted. Emily did not apply persistent pressure, nor did she exploit a close personal relationship, nor did she appeal to Smith's sympathy and pity. She

---

[77] Emily also clarified that she would "rather get cash" than accept a ride from Smith.

[78] *Taylor*, 599 P.2d at 503 (emphasis added).

[79] Smith compares "dangl[ing] connection in front of a lonely person" to "dangling bread in front of a starving person." The State counters that "[t]he next person who dies of starvation from lack of sex will be the first."

[80] One detective testified at the entrapment hearing that "the vast majority" of people he contacts through the Emily persona will end the conversation immediately once they are told that the object of their sexual desire is a thirteen-year-old.

instead merely provided Smith with a convenient opportunity to carry out his criminal intentions. We are satisfied that the resulting crimes were freely and voluntarily committed.

## CONCLUSION

¶46 We affirm the court of appeals' determinations that bindover was appropriate because Smith's conduct constituted substantial steps toward the commission of the underlying crimes and that Smith was not entrapped as a matter of law.

––––––––––––